UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>HUBERT ROTTEVEEL,<br><br>        Defendant. | CR. NO. 2:11-447 WBS<br><br>MEMORANDUM & ORDER RE: MOTION TO SUPPRESS |

----oo0oo----

Defendant Hubert Rotteveel is charged with two counts of mail fraud in violation of 18 U.S.C. § 1341 in connection with an alleged mortgage fraud scheme. Defendant moves to suppress statements made during an interview on August 17, 2010,[1] by Special Agent Chris Fitzpatrick of the U.S. Internal Revenue Service and Special Agent John Sommercamp of the Federal Bureau

---

[1] There is some discrepancy about whether the interview took place on August 17 or August 18, although it appears August 17 is the correct date.

1

1  of Investigation.  Defendant contends that the statements were
2  obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966).
3  At the time of the interview, defendant was incarcerated at the
4  Woodland Detention Facility in Yolo County for robbery charges
5  that were unrelated to the mortgage fraud investigation.  (Oct.
6  30, 2013, Tr. at 5:12-17 (Docket No. 27).)

7        Law enforcement is compelled to adhere to Miranda's
8  prophylactic procedures only when engaged in "custodial
9  interrogation."  Oregon v. Mathiason, 429 U.S. 492, 494 (1977).
10 "'[C]ustody' is a term of art that specifies circumstances that
11 are thought generally to present a serious danger of coercion."
12 Howes v. Fields, --- U.S. ----, ----, 132 S.Ct. 1181, 1189
13 (2012).  "In determining whether a person is in custody in this
14 sense, the initial step is to ascertain whether, in light of the
15 objective circumstances of the interrogation, a reasonable person
16 [would] have felt he or she was not at liberty to terminate the
17 interrogation and leave."  Id. (internal quotation marks and
18 citation omitted) (alteration in original).  This inquiry
19 requires the court to "examine the totality of the circumstances
20 surrounding the interrogation."  United States v. Craighead, 539
21 F.3d 1073, 1082 (9th Cir. 2008).

22       In conducting the initial inquiry, relevant factors
23 include "the location of the questioning, statements made during
24 the interview, the presence or absence of physical restraints
25 during the questioning, and the release of the interviewee at the
26 end of the questioning."  Howes, 132 S.Ct. at 1189 (internal
27 citations omitted).  The Ninth Circuit has also identified the
28 following five factors as relevant: "'(1) the language used to

summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual.'" United States v. Bassignani, 575 F.3d 879, 883 (9th Cir. 2009) (quoting United States v. Kim, 292 F.3d 969, 974 (9th Cir. 2002)).

If a court determines that an individual's freedom of movement was curtailed under the first inquiry, it must then assess "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." Howes, 132 S.Ct. at 1190. This second inquiry is crucial because "the freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody." Maryland v. Shatzer, 559 U.S. 98, 112 (2010).

In Howes, the Supreme Court examined custody under Miranda in the context of incarcerated individuals and held that "imprisonment alone is not enough to create a custodial situation within the meaning of Miranda." Howes, 132 S.Ct. at 1190. The Court concluded that "standard conditions of confinement and associated restrictions on freedom will not necessarily implicate the same interests that [the Miranda Court] sought to protect when it afforded special safeguards to persons subjected to custodial interrogation." Id. at 1191. The Court explained that the risks of coercion underlying the Miranda decision are not necessarily present for prisoners because a prisoner likely faces less "shock" in being questioned than a free individual who may

3

1  have been abruptly arrested; a prisoner "is unlikely to be lured
2  into speaking by a longing for prompt release"; and a prisoner
3  "knows that the law enforcement officers who question him
4  probably lack the authority to affect the duration of his
5  sentence." Id. at 1190-91.
6       In addition to the fact of imprisonment, the Court held
7  that questioning a prisoner in private or about events that took
8  place outside of the prison is also insufficient to render the
9  prisoner in custody for purposes of Miranda. Id. at 1191. The
10 Court reasoned that, unlike a free individual, isolating a
11 prisoner generally does not deprive him of a "supportive
12 environment" and security precautions taken to isolate the
13 prisoner, such as an armed guard for transport, are an "ordinary
14 and familiar attribute of life behind bars." Id. at 1192. As to
15 questioning about conduct that took place outside of the prison,
16 the Court concluded that such questioning posed no greater
17 potential for coercion than questioning about conduct that took
18 place within the prison. Id. The Court also found it
19 insignificant that a prisoner is unable to leave an interrogation
20 conference room on his own and has to wait for a guard to escort
21 him back to his cell after the interrogation concludes because
22 such restrictions would be imposed regardless of the
23 interrogation. Id. at 1193-94.
24       The Court ultimately adhered to a totality of the
25 circumstances inquiry to determine whether a prisoner is in
26 custody for purposes of Miranda. Specifically, it held that "the
27 determination of custody should focus on all of the features of
28 the interrogation," including "the language that is used in

summoning the prisoner to the interview and the manner in which the interrogation is conducted." Id. at 1192.

The Court ultimately held that the defendant in Howes was not in custody for purposes of Miranda. In reaching this conclusion, the Court recognized that there were numerous factors that could lend support to a finding of custody. Specifically, the defendant in Howes "did not invite the interview or consent to it in advance, and he was not advised that he was free to decline to speak with the deputies." Id. at 1192-93. The two deputies who interviewed defendant were also armed and the interrogation lasted five to seven hours and continued past midnight. Id. The defendant in Howes also testified that one of the deputies "[u]sed very sharp tone" and profanity on one occasion and that he told the deputies several times during the interview that he no longer wanted to speak with them. Id. at 1186, 1193.

The Court reasoned that the aforementioned circumstances were "offset by others" that negated a finding of custody. Id. at 1193. "Most important" to the Court's decision was the fact that the defendant "was told at the outset of the interrogation, and was reminded again thereafter, that he could leave and go back to his cell whenever he wanted." Id. The Court also found it significant that the door to the conference room was "sometimes left open" and that the defendant was not physically restrained or threatened, was interviewed in a "well-lit, average-sized conference room, where he was 'not uncomfortable,'" and was offered food and water. Id.

When comparing the case at hand to Howes, the interrogation of defendant in this case lacks any of the coercive features present in Howes that the Court indicated could support a finding of custody. First, both agents were unarmed. (Tr. at 54:6-7.) Second, the interview lasted only one hour in the late morning, (Tr. 59:4-5), as compared to the five to seven hours in the late evening in Howes. See also Bassignani, 575 F.3d at 886 (comparing the duration of interrogations in various cases and indicating that a relevant inquiry is whether the interrogation was a "marathon session designed to force a confession" (internal quotation marks omitted)).

Third, defendant himself testified that both agents were professional, courteous, and friendly and that the interview "seemed very casual" and was "an open kind of discussion." (Tr. at 11:5-22, 17:12-14; see also Tr. 54:22-24 (Agent Sommercamp describing the tone of the conversation as "pleasant").) According to defendant, the agents informed him that they wanted to interview him in connection with an investigation about another individual and he felt "being open to them, and discussing was going to be helpful to anything." (Tr. at 12:16-17, 17:15-17.) In fact, defendant was not aware--and the agents did not inform him--that he was under investigation, and the agents never told him he had violated any federal laws. (Tr. at 12:25-13:2, 13:11-12, 15:16-19, 16:11-21, 17:20-21, 35:19-23.) Defendant's description of the interview alone shows that defendant was never confronted with evidence of guilt and that the agents did not exert pressure to obtain a confession, both of which weigh against a finding of custody. See Bassignani, 575

F.3d at 883-84 ("We have found a defendant in custody when the interrogator adopts an aggressive, coercive, and deceptive tone . . . or 'demanded to know why [the defendant] was lying . . . .' In contrast, we have found a defendant not in custody when the officers 'did not attempt to challenge [the defendant's] statements with other "known facts" suggesting his guilt, [but] merely asked [him] about the allegations.'" (second and fourth alteration in original) (citations omitted)).

The manner in which defendant was summoned to the interview also does not lend support to a finding of custody. Defendant testified that he was in the day room and a corrections officer told him he had "a visit" and that "federal agents [were] here to see [him]" and "go visit with them." (Tr. at 10:3-10.) When the interview commenced, defendant asked the agents who they were and they gave him their business cards and asked him to take a seat at the table. (Tr. at 11:2-4, 12:10, 61:14-16.) While defendant neither invited the interview nor consented to it, and the guard did not advise him that he could decline to meet or speak with the agents, these same circumstances were insufficient to render the defendant in Howes in custody. See Howes, 132 S.Ct. at 1192-93.

Similar to Howes, the interview was held in a small conference room with a round table, which defendant described as an "attorney room." (Tr. at 12:2-11.) The defendant appeared to have some familiarity with the room because he testified that "we" also held Bible studies in the room. (Tr. at 12:2-4); see Bassignani, 575 F.3d at 885 ("[A]n interrogation conducted in familiar surroundings weighs against a finding that the defendant

7

1  was in custody."). Defendant was not restrained during the
2  interview. (Fitzpatrick Decl. ¶ 4 (Docket No. 20); Sommercamp
3  Decl. ¶ 4 (Docket No. 21).) Although the door to the conference
4  room remained closed during the interview, (Tr. at 12:5-6), the
5  court cannot draw much significance from this fact because, as
6  the Court in Howes repeatedly underscored, defendant's status as
7  a prisoner would have precluded him from leaving the room even if
8  the door remained open. See Howes, 132 S.Ct. at 1193-94.

9     The agents also testified that, at the beginning of the
10 interview after purportedly telling defendant his Miranda rights,
11 they informed him that he could terminate the interview at any
12 time. (See Tr. at 52:22-23 (Agent Sommercamp's testimony); Tr.
13 75:15-16 (Agent Fitzpatrick's testimony).) Although defendant
14 did not dispute this testimony, it is unclear whether he
15 understood he could terminate the interview. The only question
16 asked of defendant on this issue was whether he was "free to
17 leave the facility at any time," and defendant answered that he
18 was not. (Tr. 17:1-2.) While counsel may have intended to ask
19 defendant whether he felt free to leave the conference room or
20 terminate the interview, counsel's use of the word "facility"
21 precludes the court from drawing this inference because, as an
22 inmate, defendant would not have been free to leave the
23 "facility" regardless of whether he was being interrogated.
24 Nonetheless, even if defendant had testified that he felt he
25 could not terminate the interview, custody is determined under an
26 objective reasonable person standard. See Bassignani, 575 F.3d
27 at 883 ("The custody determination is objective and is not based
28 upon 'the subjective views of the officers or the individual

being questioned.'" (quoting Kim, 292 F.3d at 973)).  In the absence of any contradictory statements or conduct by the agents, a reasonable prisoner would have no reason to doubt an agent's unequivocal statement that the prisoner could terminate the interview at any time.

In Howes, for example, the Court found the most significant factor weighing against a finding of custody was that the agents told the defendant at the beginning of the interrogation and reminded him thereafter that he could leave and go back to his cell whenever he wanted.  Howes, 132 S.Ct. at 1193.  While the single instance in this case of defendant being told that he could terminate the interview at any time might not have been as effective as the repeated reminders in Howes, the lack of a subsequent reminder in the case at hand cannot sufficiently distinguish this case from Howes.  First, the more confrontational tone of the interview and the fact that the deputies were armed make it more likely that the defendant in Howes would have felt compelled to remain until the deputies indicated he was excused.  Second, given that the interview in Howes lasted four to six hours longer than the interview in this case, a reminder that the interview could be terminated seems more appropriate and potentially necessary in that case than during the one-hour interview in this case.

Overall, defendant and the agents consistently testified that the interrogation was a consensual and non-confrontational one-hour interview.  Aside from defendant's incarcerated status and isolation in the conference room, there was no evidence of coercive circumstances that would have

9

precluded a reasonable person from feeling at liberty to terminate the interrogation. Simply put, it would strain reason to hold that defendant was in custody for purposes of Miranda in light of the Court's holding that the defendant in Howes was not. Accordingly, because defendant was not in custody for purposes of Miranda, the agents were not required to inform him of his Miranda rights and the court must therefore deny defendant's motion to suppress.[2]

IT IS THEREFORE ORDERED that defendant's motion to suppress be, and the same hereby is, DENIED.

Dated: January 2, 2014

_____
WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

---

[2] The court holds only that the agents were not required to inform defendant of his Miranda rights because defendant was not in custody for purposes of Miranda. The court neither finds nor even suggests that the Government established that the Miranda warnings given in this case were sufficient.